## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERITAGE OF PRIDE, INC., | CASE NO.   14cv4165 (CM) |
| Plaintiff, | |
| - against - | |
| MATINEE NYC, INC., VOSS NYC GROUP CORP., JAKE RESNICOW, and BRANDON VOSS, | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Dated: June 9, 2014

JOSEPH A. LOY
PHILLIP A.L. HILL
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Plaintiff Heritage of Pride, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

    A.    Heritage's Well-Known NYC PRIDE Marks.............................................. 2

    B.    Matinee's Infringing Uses of NYC PRIDE ............................................. 5

ARGUMENT ......................................................................................................... 7

I.    Legal Standard ............................................................................................ 7

II.    Heritage is Likely to Succeed on the Merits ................................................. 8

    A.    Heritage Owns the Valid and Protectable NYC PRIDE Marks............................. 8

    B.    Matinee's Use Is Likely to Cause Confusion. ....................................... 9

        1.    The NYC PRIDE Marks Are Strong. ....................................... 9

        2.    Matinee's Uses Range Only from Identical to Highly Similar to the NYC PRIDE Marks. ................................................ 10

        3.    The Parties' Services Are Highly Similar............................... 13

        4.    Matinee's Use Has Caused Actual Confusion. ........................ 13

        5.    Given the Broad Spectrum of Attendees, Consumer Sophistication Does Not Outweigh a Likelihood of Confusion. ...................... 14

        6.    Matinee's Events Are Poorer in Quality................................. 15

        7.    Defendants Have Acted, and Continue to Act in Bad Faith. .................. 16

III.    Heritage Will Suffer Irreparable Harm If Preliminary Relief Is Not Granted................. 18

IV.    The Balance of Hardships Favors An Injunction............................................ 19

V.    The Public Interest Favors an Injunction. .................................................. 20

VI.    Emergency Ex Parte Relief Is Warranted. .................................................. 20

VII.    No Bond Should Be Required.................................................................... 21

CONCLUSION.................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,*
    470 F.2d 689 (2d Cir. 1972) ........................................................................... 12

*Abercrombie & Fitch Co. v. Hunting World Inc.,*
    537 F.2d 4 (2d Cir. 1976) ................................................................................. 9

*Aluminum Fabricating Co. of Pittsburgh v. Season-All Window Corp.,*
    259 F.2d 314 (2d Cir. 1958) ........................................................................... 10

*Am. Express Co. v. Am. Express Limousine Serv.,*
    772 F. Supp. 729 (E.D.N.Y. 1991) ................................................................. 12

*Clarkson Co. v. Shaheen,*
    544 F.2d 624 (2d Cir. 1976) ........................................................................... 21

*Credit Counseling Ctrs. of Am. v. Budget & Credit Counseling Servs.,*
    1997 U.S. Dist. LEXIS 2828 (S.D.N.Y. Mar. 5, 1997) .................................... 8

*Doctor's Assocs., Inc. v. Stuart,*
    85 F.3d 975 (2d Cir. 1996) ............................................................................. 21

*E. Gluck Corp. v. Rothenhaus,*
    585 F. Supp. 2d 505 (S.D.N.Y. 2008) ............................................................. 18

*Fifteenth Ave. Food Corp. v. Sibstar Bread Inc.,*
    16 Misc. 3d 1102(A) (N.Y. Sup. Ct. 2007) ...................................................... 8

*GTFM, Inc. v. Solid Clothing, Inc.,*
    215 F. Supp. 2d 273 (S.D.N.Y. 2002 ............................................................... 8

*Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.,*
    2002 WL 1543817 (S.D.N.Y July 12, 2002) ................................................... 10

*Home Shopping Club, Inc. v. Charles of Ritz Group, Inc.,*
    820 F. Supp. 763 (S.D.N.Y. 1993) ................................................................. 14

*In re Vuitton et Fils, S.A.,*
    606 F.2d 1 (2d Cir. 1979) ........................................................................... 7, 20

*Kadant, Inc. v. Seeley Mach., Inc.,*
    244 F. Supp. 2d 19 (N.D.N.Y 2003) ............................................................... 16

*Lexington Mgmt. Corp. v. Lexington Capital Partners,*
    10 F. Supp. 2d 271 (S.D.N.Y. 1998) .............................................................. 13

*McGregor-Doniger, Inc. v. Drizzle, Inc.,*
    599 F.2d 1126 (2d Cir. 1979) ......................................................................... 10

*N.Y. Progress & Protection PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ............................................................................. 7

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.,*
    704 F. Supp. 2d 305 (S.D.N.Y. 2010) ..................................................... passim

*Paddington Corp. v. Attiki Imports & Distribs., Inc.*,
   996 F.2d 577 (2d Cir. 1993) ............................................................................. 17

*Polaroid Corp. v. Polarad Elecs. Corp.*,
   287 F.2d 492 (2d Cir. 1961) .......................................................................... 9, 17

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) ............................................................................. 18

*Rodgers v. Wright*,
   544 F. Supp. 2d 302 (S.D.N.Y. 2008) ............................................................. 12

*Scarves by Vera, Inc. v. Todo Imports, Ltd.*,
   544 F.2d 1167 (2d Cir. N.Y. 1976) ................................................................. 13

*Tecnimed SRL v. Kidz-Med, Inc.*,
   763 F. Supp. 2d 395 (S.D.N.Y. 2011), *aff'd*, 462 Fed. App'x 31 (2d Cir. 2012) ..................... 18

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
   800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011), *aff'd*, 511 Fed. App'x 81 (2d. Cir. 2013)  18, 19, 20

*Varsity House v. Varsity House*,
   377 F. Supp. 1386 (E.D.N.Y. 1974) .................................................................. 8

*Virgin Enters. Ltd. v. Nawab*,
   335 F.3d 141 (2d Cir. 2003) ..................................................................... 8, 13, 16

*Yale Electric Corp. v. Robertson*,
   26 F.2d 972 (2d Cir. 1928) .............................................................................. 13

*Zino Davidoff SA v. CVS Corp.*,
   571 F.3d 238 (2d Cir. 2009) .......................................................................... 7, 20

**Statutes**

15 U.S.C. § 1114(1) ............................................................................................ 8

15 U.S.C. § 1115(a) ............................................................................................ 8

15 U.S.C. § 1125(a) ............................................................................................ 8

N.Y. Gen. Bus. L. § 133 ..................................................................................... 8

N.Y. Gen. Bus. L. § 349 ..................................................................................... 8

**Other Authorities**

J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition
   § 23:1.50 (4th ed. 2014) ............................................................................. 8, 10

Trademark Manual of Examining Procedure
   § 1210.02(a) (2014) ........................................................................................ 11

## PRELIMINARY STATEMENT

Fully aware of the immense goodwill associated with Plaintiff Heritage of Pride, Inc.'s ("Heritage") NYC PRIDE marks, Defendants have brazenly and unapologetically misappropriated the mark for their personal gain.  Heritage, one of New York's leading non-profit Lesbian, Gay, Bisexual, and Transgender ("LGBT") civil rights group, has developed strong rights in its NYC PRIDE marks through its extensive use of those marks in connection with organizing well-known events that inspire and uplift underserved sexual minority groups in New York and abroad .  Defendants' misuse of those marks has already confused, and likely will continue to confuse, consumers, press, and sponsors who are familiar with Heritage, NYC PRIDE, and associated events by causing them to believe, falsely, that there is an association, connection, affiliation, or sponsorship relationship between Defendants and NYC PRIDE.

Not only have Defendants failed to cease their violations of Heritage's rights in its marks, despite Heritage's repeated requests that they do so, but their conduct has become increasingly brazen and egregious.  In light of Defendants' ongoing willful activities, and the fact that both their events and Heritage's marquee NYC PRIDE events take place between June 27 and 30, 2014, emergency relief is required to prevent imminent and irreparable injury to Heritage, the NYC PRIDE mark, and the consuming public.  This year, over two million LGBT and LGBT-friendly attendees are expected at NYC PRIDE events; absent the emergency relief sought herein, Heritage will be irreparably harmed because Defendants' infringing activities will mislead attendees, observers, sponsors, and the press into believing, wrongly, that Defendants' events are associated, connected, or affiliated with NYC PRIDE (as indeed they already have). Moreover, there is an imminent risk that supporters who believe they are contributing to Heritage's non-profit mission will instead be lining Defendants' pockets.

## STATEMENT OF FACTS

### A.    Heritage's Well-Known NYC PRIDE Marks

Heritage is a 501(c)(3) non-profit organization that was formed in 1984 and charged with assuming the role of planning and organizing New York City's LGBT Pride events. (Compl. ¶ 15.)  Today, Heritage orchestrates inclusive events that inspire, educate, commemorate, and celebrate the diversity of the entire LGBT community. (Compl. ¶ 1.)  Among other events, Heritage organizes and hosts annual events at the end of June that commemorate the 1969 Stonewall Riots, which initiated the modern gay rights movement. (Compl. ¶ 15.)  Heritage also is a founding member of the International Association of Lesbian, Gay, Bisexual and Transgender Pride Coordinators ("InterPride"), a non-profit organization supporting 180 groups conducting LGBT Pride events around the world.  (*Id.*)

Since at least as early as 1998, the phrase "NYC Pride" has been used by Heritage and third parties to refer to Heritage and its events. (Compl. ¶ 16, Exs. D–E.)  In December 2009, Heritage formally rebranded itself as "NYC Pride" and has since operated under that trade name.[1]  (Compl. ¶ 17, Ex. F.)  On April 8, 2014, the United States Patent and Trademark Office granted Heritage a federal registration on the Principal Register in class 36 for the NYC PRIDE service mark for use in connection with "charitable fund raising services for lesbian, gay, bisexual and transgender pride cultural events" (Reg. No. 4,508,465). (Compl. ¶ 18, Ex. G.)

Heritage has produced events in connection with the federally registered NYC PRIDE service mark, its common law NYC PRIDE marks, and the NYC PRIDE tradename (collectively, the "NYC PRIDE Marks"), which have generated immense goodwill the world over. (Compl. ¶ 19, Ex. D.)  Heritage's two marquee events are free and open to the public:  the

---

[1]    For the sake of clarity, this memorandum will refer to the organization as "Heritage".

annual NYC Pride Rally, which kicks off Pride Week activities, and the annual NYC Pride March. (Compl. ¶ 19.)  The Rally occurs every year on the anniversary of the Stonewall Riots, commemorating the day when five hundred peaceful protesters gathered in Washington Square Park to express solidarity with the gay community.  (*Id.*)  This year marks the 45th anniversary of the Stonewall Riots, and for 45 years, the Rally has kicked off Heritage's annual activities. (*Id.*)

The March, which first took place in 1974, begins midday and runs from Midtown Manhattan to the West Village.  (Compl. ¶ 20.)  "Every year, more than a million spectators line Fifth Avenue to take in the outlandish costumes, elaborate floats and eye-popping performances. Groups representing the five boroughs and beyond include everything from churches and support groups to social organizations and politicians eager to get out the gay vote." (Compl. ¶ 20, Ex. D, at 4.)  In 2013, approximately 2 million people attended the NYC Pride parade to watch nearly 13,000 marchers, 350 organizations, and 68 floats.  (Compl. ¶ 20, Ex. F.)  Grand Marshalls of the NYC Pride Parade have included former Governor David A. Paterson, Senator Charles Schumer, former Mayor Michael Bloomberg, musicians Cyndi Lauper and Harry Belafonte, CEO of Kiel's Chris Salgardo, actress and *Time Magazine* cover-person Laverne Cox, New York City's first legally married same-sex couple Connie Kopelov & Phyllis Siegel, and Edie Windsor—plaintiff in *United States v. Windsor*, which resulted in the Defense of Marriage Act being ruled unconstitutional.  (Compl. ¶ 20.)  Parade marchers also have included Governor Andrew Cuomo, and then-candidate for Mayor Bill de Blasio.  (*Id.*)

In addition to the Rally and March, Heritage has expanded the roster of NYC PRIDE to include Family Movie Night, Teaze (formerly known as "Rapture on the River"), PrideFest, the VIP Rooftop Party, and the Dance on the Pier, among other official and officially licensed events

like WE Party.  These events attract well over a million attendees and receive extensive, positive, and unsolicited press coverage not only in New York, but across the country and around the world.  (Compl. ¶ 25, Ex. D.)

As one of the leading LGBT organizations, Heritage's NYC PRIDE-branded events have featured such well-known performers and guests as Cher, Whitney Houston, Jennifer Hudson, Janet Jackson, Lady Gaga, Cyndi Lauper, Lil' Kim, Jennifer Lopez, Madonna, Idina Menzel, Bette Midler, Liza Minnelli, Kylie Minogue, Rosie O'Donnell, RuPaul, and many others.  (Compl. ¶ 21.)  Heritage's events have also attracted many high-profile corporate sponsors whose financial support helps to make NYC PRIDE events possible.  (Compl. ¶ 22.)  This year's NYC PRIDE sponsors include such well-known and varied companies as Coca-Cola, Vitamin Water, TD Bank, Delta Airlines, NetFlix, Budweiser, NBC, Whole Foods, Macy's, Wells Fargo, W Hotels, Marriott, Amtrak, Comcast NBCUniversal, MasterCard, Citi, HSBC, Walgreens, Johnson & Johnson, Showtime Networks, and State Farm Insurance, among others.  (Compl. ¶ 22.)  Indeed, companies who associate with NYC PRIDE by, for example, sponsoring or participating in NYC PRIDE events, often enjoy the attendant goodwill of that association.  (*See* Compl. ¶ 22, Ex. D, at 20.)  NYC PRIDE has over 50,000 fans on Facebook, 12,000 followers on Twitter, and over 5,000 e-newsletter recipients.  (Compl. ¶ 23.)  It has a base of over 10,000 active donor addresses.  (Compl. ¶ 23.)  Heritage sells its NYC PRIDE tickets at http://nycpride.showclix.com and http://www.showclix.com/events/nycpride.  (Compl. ¶ 24.)

As evidenced by Heritage's successful and extensive use of the NYC PRIDE Marks in connection with its events, the NYC PRIDE Marks are clearly distinctive, strong, and widely understood by consumers as signifying the leading LGBT Pride events in New York City, and their organizer.

**B.     Matinee's Infringing Uses of NYC PRIDE**

According to its website, since 2010 Matinee NYC, Inc. has been in the business of producing for-profit concerts whose target audience is gay men. (Compl. ¶ 27, Ex. I.)  Matinee NYC, Inc., Voss NYC Group Corp., Jake Resnicow, and Brandon Voss (collectively, "Matinee" or "Defendants") have worked together in producing such events. (*See* Compl. Ex. A.)  Only this year has Matinee begun repositioning its services so that it offers a multi-day slate of events that conflict with Heritage's multi-day slate of NYC Pride events, and undertaken a systematic effort to misappropriate the NYC PRIDE Marks in connection with Matinee's for-profit activities, even though Matinee is not affiliated or in a sponsorship relationship with Heritage or any other LGBT Pride organization. (*See* Compl. ¶¶ 30–31.)  Specifically, Matinee has misappropriated the NYC PRIDE Marks to advertise and promote its for-profit, multi-day slate of events occurring in New York City on the same days as the NYC PRIDE events, but targeting only gay men. (*See* Compl. ¶¶ 30–32.)  Matinee's unauthorized use of the NYC PRIDE Marks includes (1) referring to Matinee's unaffiliated activities during NYC Pride Week as "NYC Pride Event[s]" or "NYC Pride Main Event[s]"; (2) referring to performers at its unaffiliated events as "headlin[ing] NYC Pride"; (3) falsely and misleadingly claiming that its unaffiliated events were "added to the NYC Pride line-up"; (4) designating its unaffiliated weekend passes as "NYC PRIDE WEEKEND PASSES"; (5) falsely and misleadingly suggesting that Matinee "Present[s] New York Pride"; (6) referring to itself as "MATINEE NYC PRIDE"; and (7) selling its tickets at www.showclix.com/event/nycpride.   (Compl. ¶ 32.)  Moreover, virtually all of Matinee's infringing uses occur in connection with prominent and highly sexualized imagery targeting gay men. (Compl. ¶ 33–35.)

Many of these unauthorized uses of Heritage's NYC PRIDE mark occurred after Heritage first contacted Matinee on April 2, 2014, and demanded that it immediately cease its

unauthorized use of the NYC PRIDE mark; after Heritage's registration for NYC PRIDE issued, which put Matinee on constructive notice of Heritage's rights in the mark; and even after Heritage put Matinee on actual notice of the registration on April 29, 2014.  (Compl. ¶¶ 36–37.) In fact, Matinee's misuse has worsened over time.  (Compl. ¶ 34, Ex. B.)  For example, on May 31, 2014, Matinee sent an email whose sender was identified as "NYC Pride" using an email address of nycpride2014@gmail.com, the body of which prominently displayed an image containing the phrase "NYC PRIDE" and falsely stated that "SUPREME FESTIVAL, BRANDON VOSS & JAKE RESNICOW PRESENT" followed immediately by a logo incorporating the phrase " NYC PRIDE", followed by a listing of the dates during which Heritage's NYC PRIDE events occur.  The email advertises "NYC PRIDE WEEKEND PASSES" and closes by listing an entity called "NYC Pride" with a New York City address unaffiliated with Heritage.  (Compl. ¶ 34, Ex. B.)

On June 2, 2014, Matinee sent a substantially similar email from a sender called "NYC Pride 2014" with an email address of nycpride@vossnyc.com.  (Compl. ¶ 35, Ex. C.)

On June 4, 2014, Heritage contacted Matinee with a final cease and desist letter, putting them on notice of a federal lawsuit if they did not cease their infringing activities.  (Compl. ¶ 36, Ex. J.)  After Matinee's counsel acknowledged receipt, Matinee sent out further infringing advertisements.  (Compl. ¶ 36, Ex. K.)

Matinee's conduct has already caused confusion.  (Compl. ¶¶ 38–39.)  For example, Azealia Banks, who was heavily criticized for her recent homophobic comments directed at blogger Perez Hilton,  and is a headliner at a Matinee event, has been wrongly identified by numerous individuals and organizations as a performer at NYC PRIDE.  (*Id.*)  Criticism for Matinee's choice has been misdirected NYC PRIDE.  (Compl. ¶ 39.)

# ARGUMENT

## I.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 permits a court to issue preliminary relief where the plaintiff establishes that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in its favor, and (4) that the public interest would not be disserved by issuing an injunction. *See, e.g., N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).[2] Rule 65(b) permits the Court to grant preliminary relief *ex parte* via a temporary restraining order where (1) "failure to issue it would result in 'immediate and irreparable injury, loss or damage' and (2) the applicant sufficiently demonstrates the reason that notice 'should not be required.'" *In re Vuitton et Fils, S.A.*, 606 F.2d 1, 4–5 (2d Cir. 1979) (per curiam) (affirming TRO in trademark infringement case, reasoning that "the Rule by its very terms allows for the issuance of an *ex parte* temporary restraining order" in such circumstances"); *see also Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 242 (2d Cir. 2009) (affirming grant of TRO converted to preliminary injunction in trademark infringement case).  Because, as discussed in greater detail below, Matinee's ongoing willful violation of Heritage's rights in the NYC PRIDE Marks is likely to cause consumer confusion in connection with Heritage's signature Pride Week events, emergency relief is both necessary and appropriate to prevent such confusion at a crucial time for Heritage and the NYC PRIDE Marks.

---

[2]    The Second Circuit has continued to allow parties to obtain a preliminary injunction in certain instances under a "traditional test" that requires either: (1) a likelihood of success on the merits; or (2) (a) sufficiently serious questions going to the merits to make them a fair ground for litigation and (b) a balance of hardships tipping decidedly in the movant's favor. *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 242 (2d Cir. 2009) (affirming grant of temporary restraining order converted to preliminary injunction in trademark case); *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 313 (S.D.N.Y. 2010) (collecting cases).  The elements of the traditional test are subsumed within the elements outlined in *N.Y. Progress & Protection*, all of which weigh in favor of a preliminary injunction in this case as explained more fully below.  Thus, regardless of which test applies, Heritage is entitled to preliminary relief.

## II.     HERITAGE IS LIKELY TO SUCCEED ON THE MERITS

Under both 15 U.S.C. § 1114(1) and 1125(a), a plaintiff must show (1) that its mark is

entitled protection, and (2) that the defendant's use of the mark is likely to cause confusion as to

the origin or sponsorship of the defendant's goods.  *See, e.g., Virgin Enters. Ltd. v. Nawab*, 335

F.3d 141, 146 (2d Cir. 2003)  (reversing denial of preliminary injunction for trademark

infringement).  Both elements are met here, where Heritage owns a federally registered mark and

enjoys common law rights in other marks and trade names, and Matinee's unauthorized use of

Heritage's mark is likely to, and already is causing confusion.[3]

### A.     Heritage Owns the Valid and Protectable NYC PRIDE Marks.

Heritage owns a federal registration for the NYC PRIDE service mark, which provides

*prima facie* evidence of Heritage's valid and exclusive right to use that mark in commerce in

connection with "charitable fund raising services for lesbian, gay, bisexual and transgender pride

cultural events" and related services.  *See* 15 U.S.C. § 1115(a).

---

[3]   For the same reasons, the same likelihood of confusion test will apply to claims of New York's Deceptive
Business Practices, N.Y. Gen. Bus. L. § 349.  *See, e.g., New York City Triathlon*, 704 F. Supp. 2d at 325 n.7
(granting preliminary injunction, noting that defendant's "misbranding of itself, suggesting an affiliation with
Plaintiff when no such affiliation exists" violates § 349); *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d
273, 301–02 (S.D.N.Y. 2002) (granting preliminary injunction, finding § 349 violation because defendant
intentionally used a designation "in a manner confusingly similar to [plaintiff's] use of [its own] trademark, and
caus[ed] actual confusion."); *see also* J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition §
23:1.50 (4th ed. 2014) ("[T]he test of infringement under both federal and state law is whether there will be a
likelihood of confusion." (collecting cases)); id. § 23:1 ("[T]he test of likelihood of confusion is the touchstone
of trademark infringement as well as unfair competition." (collecting cases)).

New York courts assess common law unfair competition claims using the same likelihood of confusion test plus
a showing that the defendant acted in bad faith.  *See New York City Triathlon*, 704 F. Supp. 2d at 325.
Similarly, courts find misuse of a trade name under N.Y. Gen. Bus. L. § 133. where a defendant has used the
trade name of another firm (1) with intent to (2) deceive the consumer or public as to the user's identity, or
connection.  *See Credit Counseling Ctrs. of Am. v. Budget & Credit Counseling Servs.*, 1997 U.S. Dist. LEXIS
2828, at *13 (S.D.N.Y. Mar. 5, 1997) (granting a preliminary injunction, finding  intent to deceive and likely
confusion in telephone listing scheme).  However, courts may enjoin the use of a misleading name without
proof of intent to deceive or the existence of actual confusion." *Varsity House v. Varsity House*, 377 F. Supp.
1386, 1388 (E.D.N.Y. 1974); *see also Fifteenth Ave. Food Corp. v. Sibstar Bread Inc.*, 16 Misc. 3d 1102(A),
1102A (N.Y. Sup. Ct. 2007) (holding that an injunction may be issued "if it shall appear to the satisfaction of
the court . . .that the defendant is in fact assuming, adopting or using such name . . . [which] . . . may deceive or
mislead the public:).

Moreover, Heritage acquired common law rights in its NYC PRIDE Marks and trade name through their use in association with Heritage's non-profit events, which have achieved great success and acclaim as evidenced by the millions of people who have attended NYC PRIDE events over the years, the many high-profile individuals and organizations that have participated in or sponsored those events, and the tremendous positive, unsolicited press coverage the events have received all over the world. Thus, the NYC PRIDE Marks are strong and highly distinctive signifiers of Heritage's services in orchestrating New York City's renowned LGBT Pride events. *See New York City Triathlon*, 704 F. Supp. 2d at 316 (finding NYC TRIATHLON and related marks valid and strong "[g]iven the great success of the NYC Triathlon, the extensive media coverage, and the strong reputation Plaintiff has developed among consumers."). Thus, Heritage's NYC PRIDE Marks are valid and protectable.

**B.      Matinee's Use Is Likely to Cause Confusion.**

When assessing a likelihood of confusion, courts in the Second Circuit apply the eight-factor *Polaroid* balancing test. *Polaroid Corp. v. Polorad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). Those factors are (1) strength of the mark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market. Here, each factor weighs in favor of finding a likelihood of confusion.

**1.      The NYC PRIDE Marks Are Strong.**

Courts assess a mark's strength in terms of its conceptual and commercial strength. First, trademarks are generally classified according to their conceptual strength. *See Abercrombie & Fitch Co. v. Hunting World Inc.*, 537 F.2d 4, 9–11 (2d Cir. 1976). Where, as here, the USPTO

registers a mark without requiring evidence of secondary meaning, the mark is presumed to be inherently distinctive. *See, e.g.*, *Aluminum Fabricating Co. of Pittsburgh v. Season-All Window Corp.*, 259 F.2d 314, 316 (2d Cir. 1958) ("[T]he courts should not overrule the action of the Patent Office to whose care Congress has entrusted the preliminary determination as to whether a mark fulfills the requirements of the statute."); 2 McCarthy § 11:43.

More importantly, however, although the "categories can be useful for analytical purposes, the strength of the mark depends ultimately on its distinctiveness, or its 'origin-indicating quality, in the eyes of the purchasing public.'" *Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.*, 2002 WL 1543817, at *3 (S.D.N.Y July 12, 2002) (citing *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1129 (2d Cir. 1979) (granting preliminary injunction where plaintiff established mark's strength through a combination of conceptual and commercial strength)). Here, no matter how the NYC PRIDE Marks are categorized, they are strong because of their significant commercial strength, as discussed *supra*, Section II.A. *See New York City Triathlon*, 704 F. Supp. 2d at 316 (finding NYC TRIATHLON and related marks strong "[g]iven the great success of the NYC Triathlon, the extensive media coverage, and the strong reputation Plaintiff has developed among consumers."). Accordingly, this factor favors Heritage.

### 2. Matinee's Uses Range Only from Identical to Highly Similar to the NYC PRIDE Marks.

In those instances where Matinee uses the NYC PRIDE Marks verbatim, this factor necessarily weighs heavily in favor of finding a likelihood of confusion. In some instances Matinee substitutes the expanded words "New York City" or "New York" in place of the abbreviation "NYC". Such use does not save Matinee from liability because (1) Heritage also has used the related mark "New York City Pride", and (2) commonly known abbreviations,

particularly geographic locations, and their expanded form are treated the same. *See New York City Triathlon*, 704 F. Supp. 2d 305 (finding that defendants "NYC Triathlon Club," "NYC Tri Club," and "New York City Triathlon Club" infringed plaintiff's as-yet unregistered "New York City Triathlon" mark); *cf.* Trademark Manual of Examining Procedure § 1210.02(a) (2014) ("A geographic name . . . or an abbreviation or other variant of the name of a geographic location, is treated the same as the actual name of the geographical location, if it is likely to be perceived as such by the purchasing public."). In instances where Matinee appropriates the NYC PRIDE Marks into its own logo, the resulting logo is confusingly similar:

## Matinee



## Heritage

 



  



Here, both parties use the phrase "NYC PRIDE" in all caps, using substantially identical sans serif fonts. The "NYC" portions of both logos are written in an outline font, followed by the word "PRIDE" in solid lettering.

Moreover, Matinee's use of the NYC PRIDE Marks together with additional words or marks does not alter the confusing nature of Matinee's misuse, and in many instances serves only to exacerbate confusion. *See, e.g.*, *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972) (finding addition of "by Bradley" did not prevent confusion between plaintiff's protected "Cross" pens and defendant's "LaCross by Bradley" pens); *Rodgers v. Wright*, 544 F. Supp. 2d 302, 311 (S.D.N.Y. 2008) (defendants' spin-off musical group "First Ladies of Chic" was confusingly similar to original "Chic"); *Am. Express Co. v. Am. Express Limousine Serv.*, 772 F. Supp. 729, 733 (E.D.N.Y. 1991) (finding the defendant's addition of "Limousine Services" to the plaintiff's "American Express" mark enhanced rather than dispelled confusion).

Finally, Matinee sells its tickets at confusingly similar subdomains of the same online ticket vendor that Heritage uses for its NYC PRIDE events. In particular, Heritage's tickets are

sold at http://nycpride.showclix.com and http://ww.showclix.com/events/nycpride, while Matinee's tickets are sold at www.showclix.com/event/nycpride.  ShowClix is a general use ticket vendor, and both parties' addresses use the term "nycpride."  Nothing in Matinee's URL for ticket sales indicates that the link leads to Matinee's events rather than NYC PRIDE's events.

Thus, this factor weighs heavily in favor of finding a likelihood of confusion.

### 3.    The Parties' Services Are Highly Similar.

The proximity and bridging factors assess whether the parties' products or services "are sufficiently related that customers are likely to confuse the source of origin." *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1173 (2d Cir. N.Y. 1976) (granting a preliminary injunction, finding similarity where defendant's cosmetics, perfume, and toiletries products "were by their nature so closely related to the plaintiff's own [apparel] products"); *id.* ("[I]t has come to be recognized that, unless the borrower's use is so foreign to the owners as to insure against any identification of the two, it is unlawful." (quoting *Yale Electric Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928) (Hand, J.); *Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 285 (S.D.N.Y. 1998) (granting a preliminary injunction, holding that the "combination of actual and potential overlap practically ensures customer confusion" in light of similarities in consumer base, marketing channels, purpose of products or services).

Here, both parties are active in the same field of hosting LGBT-oriented events, including dance parties and celebrity performances, but Matinee targets specifically the gay male subset of Heritage's demographic.  Moreover, both parties are hosting a multi-day slate of events during the same three-days in June, in the same city.  Thus, this factor also heavily favors Heritage.

### 4.    Matinee's Use Has Caused Actual Confusion.

While a plaintiff need not submit evidence of actual confusion to prevail, such evidence is powerful evidence of a likelihood of confusion. *E.g., Virgin Enters. Ltd.*, 335 F.3d at 151 ("It

is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion."); *Morningside Grp.*, 182 F.3d at 141 ("Evidence that confusion has actually occurred is of course convincing evidence that confusion is likely to occur.").

Here, over a relatively short period of time, there have already been numerous instances of actual confusion. For example, individuals and the media have wrongly characterized Azealia Banks—who was heavily criticized for her recent homophobic comments directed at a well-known gay blogger, and who is a headliner at a Matinee event—as a performer at NYC PRIDE, and have even criticized NYC PRIDE, in the mistaken belief that NYC PRIDE is responsible for her appearance. Because Matinee's activities not only have resulted in consumer confusion, but also in harm to NYC PRIDE's goodwill, this factor weighs heavily in favor of finding a likelihood of confusion.

### 5. Given the Broad Spectrum of Attendees, Consumer Sophistication Does Not Outweigh a Likelihood of Confusion.

The less sophisticated the average consumer of a product, the more likely that similarity in trademarks will result in confusion. *Home Shopping Club, Inc. v. Charles of Ritz Group, Inc.*, 820 F. Supp. 763, 772 (S.D.N.Y. 1993) (granting a preliminary injunction where there was no evidence to support a high level of consumer sophistication for very similar products). Further, where the relevant market contains a range of amateur and experienced consumers, and a "highly sophisticated consumer" actually confused the parties' goods or services, then this factor favors a likelihood of confusion. *New York City Triathlon*, 704 F. Supp. 2d at 320.

Here, there will be well over a million (and possibly over two million) attendees at NYC PRIDE events this year, who will necessarily run the gamut of sophistication given the public nature of NYC PRIDE's events and their stated goal of celebrating diversity and inclusiveness—even including those who overtly abhor homosexuality, such as the Catholic League, which

Heritage has permitted to participate in the March. (*See* Compl. ¶ 1, Ex. D, at 9, Ex. F, at 31.) Moreover, in light of NYC PRIDE's global appeal, attendees at NYC PRIDE events will necessarily range from first time visitors to native New Yorkers. Thus, a significant number of attendees likely will be unfamiliar with NYC PRIDE and tend to rely on signals such as trademarks to inform them about which events are affiliated with NYC PRIDE, whose events they came to see. Further, the evidence of actual confusion includes consumers who are likely considered more sophisticated, including an article from the prominent New York City music blog Brooklyn Vegan, and individuals who had prior familiarity with NYC PRIDE. Thus, this factor also weighs in favor of finding a likelihood of confusion.

### 6.  Matinee's Events Are Poorer in Quality.

This factor "generally considers whether the senior user's reputation could be tarnished by inferior merchandise [or services] of the junior user." *New York City Triathlon*, 704 F. Supp. 2d at 340 (quotations omitted). Here, Matinee's events are inferior. For example, the Twitter users who wrongly directed at NYC PRIDE the disappointment over Matinee's choice to have Azealia Banks as a headliner shows both the relative quality of headliners that the parties are able to draw, and the care that both parties apply when selecting their performers.

Additionally, individuals attending NYC PRIDE events—particularly those purchasing multi-day weekend passes like those promoted by Matinee—expect to be able to support and participate in a slate of events that celebrate the entire LGBT community, even if particular events celebrate particular subsets of the LGBT community. Matinee's events, however, are comprised entirely of events that cater primarily to gay men. As a result, Matinee offers a substantially narrower "LGBT Pride" experience than consumers have come to expect from NYC PRIDE.

The Second Circuit has recognized that "the comparative difference in quality of the products . . . is one of the less probative factors in a determination of the likelihood of confusion" because "differing quality really goes more to the harm that confusion can cause than it does the likelihood of confusion itself." *New York City Triathlon*, 704 F. Supp. 2d at 340 (citing *Virgin Enters*, 335 F.3d at 151–52. Here, the confusion will harm consumers because those who attend Matinee's events under the false impression that they are attending NYC PRIDE events will receive a substantially narrower and poorer experience than they would expect from NYC PRIDE. Moreover, Matinee's single-minded emphasis on the gay male demographic would jeopardize Heritage's goodwill if consumers, sponsors, or the media mistakenly believe that NYC PRIDE also narrowly focuses on the gay male subset of the LGBT community.

Further, as explained *supra*, Section II.B.5, attendees at NYC PRIDE run the gamut from first time attendees to seasoned veterans, and even from members and supporters of the LGBT community to those who outright oppose them, like the Catholic League. (*See* Compl. ¶ 1, Ex. D, at 9, Ex. F, at 31.)NYC PRIDE has strived to create an experience that is fun and festive, but also representative and inclusive. Heritage takes seriously its role as an ambassador for the LGBT community, and that work is undermined when the public wrongfully attributes the work of someone like Matinee to Heritage. Accordingly, this factor also weighs in favor of a finding of a likelihood of confusion.

### 7. Defendants Have Acted, and Continue to Act in Bad Faith.

Bad faith is found where a defendant adopts or uses a mark with the goal or intention of capitalizing on the plaintiff's reputation and goodwill through any confusion or deception. *Kadant, Inc. v. Seeley Mach., Inc.*, 244 F. Supp. 2d 19, 32 (N.D.N.Y 2003) (finding bad faith where defendant's company used mark in same industry and within same geographic area as plaintiff). Bad faith may be presumed where a defendant has prior knowledge of a mark and

there are strong similarities between the parties' uses of their respective marks, or where the defendant has intentionally copied the plaintiff's mark. *See New York City Triathlon*, 704 F. Supp. 2d. at 339 (citing *Paddington Corp. v. Attiki Imports & Distribs., Inc.*, 996 F.2d 577, 586 (2d Cir. 1993)).

Here, Matinee's bad faith is evident. As organizers of events targeting gay men in New York City during NYC Pride Week, it is unimaginable that Matinee was ignorant of the NYC PRIDE Marks or events. Moreover, Matinee has continued and even increased its infringing behavior despite having prior knowledge of Heritage's common law rights when Heritage first contacted Matinee on April 2, 2014; having constructive knowledge of Heritage's federal rights as of the time the registration issued on April 8, 2014; and having actual knowledge of those federal rights when Heritage followed up after the registration issued. Further, as discussed *supra*, Section II.B.2, Matinee's various misuses of the NYC PRIDE Marks range only from identical to highly similar to Heritage's use. Indeed, Matinee has actually represented itself as an organization called "NYC Pride" on at least two occasions.

Thus, this factor weighs heavily in favor of finding a likelihood of confusion.

\* \* \*

In light of the foregoing, all of the *Polaroid* factors weigh in favor of finding a likelihood of confusion, some of them strongly so. Thus, Heritage has established a likelihood of success on the merits of its claims.[4]

---

[4] Additionally, Matinee's bad faith, coupled with the fact that all the Polaroid factors weigh in favor of likelihood of confusion, means that Heritage is likely to succeed on its claims of New York deceptive practices, misuse of a name, and common law unfair competition.

**III.  HERITAGE WILL SUFFER IRREPARABLE HARM IF PRELIMINARY RELIEF IS NOT GRANTED.**

Some courts in the Second Circuit continue to apply the presumption that irreparable injury naturally flows from demonstrating trademark infringement or, when seeking preliminary relief, a likelihood of success on the merits. *See, e.g., E. Gluck Corp. v. Rothenhaus*, 585 F. Supp. 2d 505, 519 (S.D.N.Y. 2008) (distinguishing *eBay*, crediting presumption of irreparable harm, and issuing injunction in trademark case). Even absent the presumption, however, courts agree that trademark infringement causes harm in the form of lost control over the mark and damage to the mark owner's reputation, both of which are recognized as difficult to quantify and sufficient to constitute irreparable harm. *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 411 (S.D.N.Y. 2011) (granting preliminary injunction, finding irreparable injury where trade dress owner faces risk of loss difficult to quantify), *aff'd*, 462 Fed. App'x 31 (2d Cir. 2012); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011) (granting permanent injunction absent presumption, holding that likelihood of confusion means that "the reputation and goodwill cultivated by [senior user] PRL would be out of its hands. . . . [T]he impression given to consumers by the USPA Parties' product, and so the reputation and goodwill of the PRL Parties', will not be in PRL's control."), *aff'd*, 511 Fed. App'x 81 (2d. Cir. 2013) (affirming permanent injunction and finding of irreparable harm because mark owner "would be irreparably harmed by ceding . . . control over its reputation and goodwill."); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (affirming preliminary injunction and finding of irreparable harm because of "loss of reputation, good will, and business opportunities").

Here, as discussed *supra*, Section II.B.4, Matinee's use has already caused consumer confusion and likely will continue to cause such confusion. As a result of Matinee's violations of Heritage's trademark rights, Heritage has suffered and will continue to suffer incalculable

harm to the goodwill that the NYC PRIDE Marks enjoys, and a loss of control over that mark. Moreover, that irreparable harm threatens to imminently and exponentially increase absent an injunction prior to this June 27, 2014, when both parties' events are scheduled to occur.

## IV.     THE BALANCE OF HARDSHIPS FAVORS AN INJUNCTION.

Courts within this circuit routinely find that the balance of hardships favors an injunction in circumstances such as those presented here.  For example, in *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, this Court granted a preliminary injunction to the owner of common law rights in NYC TRIATHLON and related marks, finding that the balance of hardships "tips decidedly" in favor of an injunction because the plaintiff (1) had established substantial good will in the marks, (2) lost some of that good will and ability to control its reputation "at the moment" defendant launched its infringing "NYC Triathlon Club" name, and (3) would continue to suffer such losses until defendant was enjoined.  704 F. Supp. 2d at 344.  As the Court explained, the balance did not favor the defendant because (1) "[t]here seems to be no reason why Defendant could not just as easily select another new non-infringing name," (2) requiring such changes would not "preclude[] Defendant from selling its products or services," and (3) the defendant had established little or no goodwill in the mark.  *Id.*

Similarly, in *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc*, this Court granted a permanent injunction, holding that the "substantial likelihood of consumer confusion" and potential loss to the mark owners "both in terms of sales and reputation" outweighed the opposing parties' hardships in the form of wasted production of 10,000 units of infringing goods, 3,500 of which were already sold.  800 F. Supp. 2d at 541.

The same is true here: the harm to Heritage's substantial goodwill and ability to control its marks clearly outweighs any harm that Matinee would suffer from being compelled to change its unlawful promotional strategies and recently adopted (and inconsistently applied) business

names. Matinee could easily and cheaply cease using its misleading email accounts and change their advertising, which at this point appear exclusively digital. Further, Matinee is fully able to describe the time period and location of its events and its intended demographics without encroaching on Heritage's rights. Thus, the balance of hardships favors the issuance of an injunction to prevent consumer confusion and further violations of Heritage's trademark rights.

## V.   THE PUBLIC INTEREST FAVORS AN INJUNCTION.

Courts in this jurisdiction have held that the consuming public's "protectable interest in being free from confusion, deception, and mistake" is sufficient for this factor to weigh in favor of an injunction. *See, e.g., U.S. Polo Ass'n*, 800 F. Supp. 2d at 541.; *New York City Triathlon*, 704 F. Supp. 2d at 344 (granting motion to enforce preliminary injunction and denying motion to vacate, reasoning that "the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality."). Here, the public interest would be served by an injunction that remedies the confusion that Matinee's actions are likely to create, and indeed have already created, as well as preventing further confusion during Pride Week, when the danger of such confusion will be greatest.

## VI.   EMERGENCY EX PARTE RELIEF IS WARRANTED.

Rule 65(b) permits the Court to grant preliminary relief *ex parte* via a temporary restraining order where (1) "failure to issue it would result in 'immediate and irreparable injury, loss or damage' and (2) the applicant sufficiently demonstrates the reason that notice 'should not be required.'" *In re Vuitton et Fils, S.A.*, 606 F.2d at 4–5; *Zino Davidoff SA*, 571 F.3d at 242.

Here, as discussed above, Heritage has already suffered, and is presently suffering irreparable injury. If Matinee's acts are not enjoined prior to the events scheduled at the end of this month, then Heritage's irreparable injury threatens to increase imminently and exponentially. In light of these impending events, relief cannot wait until Matinee can be heard

for a preliminary injunction.  Moreover, absent this Court's intervention, Matinee has

affirmatively demonstrated that it will continue its unlawful activities, which have only increased

in severity to date.  Further, Matinee has been on notice of the claims at issue here since at least

April 2, 2014, and has even pressed certain arguments (meritless though they were) in

correspondence with Heritage.  Matinee has had actual notice since at least as early as June 5,

2014 that Heritage would file this law suit on this date and would seek emergency relief.  Thus,

Matinee is well-positioned to timely respond to this Court's action as the Federal Rules permit.

## VII.    NO BOND SHOULD BE REQUIRED.

Federal Rule of Civil Procedure 65(c) requires bonds only "in such sum as the court

deems proper . . . ."  The Second Circuit has held that the decision to order that a bond be posted

at all is "within the sound discretion of the trial court, [and] the district court may dispense with

the filing of a bond."  *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976); *see also*

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (affirming preliminary

injunction, finding no error in district court not requiring a bond); *New York City Triathlon*, 704

F. Supp. 2d at 345 (declining to require a bond because defendant would "not likely suffer any

harm absent the posting of a bond, and the [plaintiff's] likelihood of success on the merits is

overwhelming.").

Here, no bond should be required because Matinee can easily and cheaply alter its

promotional tactics and, given Matinee's willful, wanton, and continually aggravated

infringement of the NYC PRIDE Marks, Heritage's likelihood of success on the merits is

overwhelming.  Moreover, in light of the fact that Heritage is a non-profit organization operating

in the public interest, this Court should exercise its equitable discretion to allow Heritage to seek

this Court's relief without diverting scarce resources to insure against harm to Matinee's

legitimate interests, of which there are none.

## CONCLUSION

For the foregoing reasons, Heritage respectfully requests that the Court grant its application for a temporary restraining order and preliminary injunction.

Respectfully submitted,

Dated: June 9, 2014
      New York, New York

JOSEPH A. LOY
PHILLIP A.L. HILL
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Plaintiff.*